```
IN THE UNITED STATES DISTRICT COURT
  FOR THE WESTERN DISTRICT OF TENNESSEE
            WESTERN DIVISION
```
_____

UNITED STATES OF AMERICA,        )
                                 )
     Plaintiff,                  )
                                 )
v.                               )    No. 13-cr-20255-STA-tmp
                                 )
CODY CATHEY,                     )
                                 )
     Defendant.                  )

_____

### REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Cody Cathey's Motion to Suppress, filed on October 9, 2013. (ECF No. 20.) The government filed a response in opposition on October 29, 2013. (ECF No. 24.) On November 25, 2013, the court held a suppression hearing on the motion. The government called Officer Darryl Dotson and Officer Otis Edwards of the Memphis Police Department ("MPD") as witnesses. The defendant testified, and called as witnesses Teresa Gunn (a resident of the apartment complex where the incident in question occurred) and James Hill (Cathey's nephew). The court also received into evidence a consent to search form purportedly signed by Cathey.[1]

---

[1] The transcript of the suppression hearing was docketed on December 9, 2013. (ECF No. 34.)

For the reasons below, it is recommended that Cathey's Motion to Suppress be denied.

## I. PROPOSED FINDINGS OF FACT

On February 14, 2013, at approximately 12:45 p.m., Officer Darryl Dotson, Officer Otis Edwards, and three other officers with the MPD responded to a complaint call reporting that a black male was selling marijuana at                    at the Foxwood Apartments, located at                          in Memphis, Tennessee. The complainant provided the MPD with a physical description of the man who was selling the drugs. The MPD had previously received numerous complaints about drugs being sold from that location. The officers arrived at the scene, set up surveillance, and observed three black men standing outside in front of the apartment. One of the men, later identified as defendant Cody Cathey, matched the description provided by the complainant. The officers then approached the three men, without drawing their weapons or activating any lights or sirens.[2] Officer Dotson approached Cathey, told him that they were there to investigate a drug complaint, and asked Cathey if he had anything illegal on him, such

---

[2] Officer Edwards testified that the officers observed hand-to-hand drug transactions before approaching the men. Officer Dotson made no mention of observing these transactions during his testimony. Also, the government in its response brief makes no mention of the officers observing hand-to-hand drug transactions prior to approaching the three men. The government also does not rely on purported hand-to-hand transactions to support the officers' decision to approach the men.

For the reasons below, it is recommended that Cathey's Motion to Suppress be denied.

## I. PROPOSED FINDINGS OF FACT

On February 14, 2013, at approximately 12:45 p.m., Officer Darryl Dotson, Officer Otis Edwards, and three other officers with the MPD responded to a complaint call reporting that a black male was selling marijuana at                    at the Foxwood Apartments, located at                          in Memphis, Tennessee. The complainant provided the MPD with a physical description of the man who was selling the drugs. The MPD had previously received numerous complaints about drugs being sold from that location. The officers arrived at the scene, set up surveillance, and observed three black men standing outside in front of the apartment. One of the men, later identified as defendant Cody Cathey, matched the description provided by the complainant. The officers then approached the three men, without drawing their weapons or activating any lights or sirens.[2] Officer Dotson approached Cathey, told him that they were there to investigate a drug complaint, and asked Cathey if he had anything illegal on him, such

---

[2] Officer Edwards testified that the officers observed hand-to-hand drug transactions before approaching the men. Officer Dotson made no mention of observing these transactions during his testimony. Also, the government in its response brief makes no mention of the officers observing hand-to-hand drug transactions prior to approaching the three men. The government also does not rely on purported hand-to-hand transactions to support the officers' decision to approach the men.

as drugs or weapons.[3] Cathey responded that he had "smoking weed" in his jacket pocket and also indicated that he was wearing a colostomy bag. Officer Dotson conducted a pat down of Cathey's person and located thirteen individually wrapped bags of marijuana in his jacket pocket. At that point, the officers escorted Cathey into his residence, which was on the ground level of the apartment complex and about five feet away from where they were standing. Cathey was not placed in handcuffs when he entered the apartment with the officers. During the entire encounter, the officers did not raise their voices, activate their lights or sirens, or draw their weapons. Cathey appeared to be calm and was cooperative with the officers.[4]

At some point during the officers' encounter with Cathey, the officers obtained Cathey's consent to search his residence. Officer Dotson testified that he asked for and obtained Cathey's verbal and written consent to search the apartment immediately

---

[3] Cathey testified that the officers approached him with guns drawn and commanded him to get on the ground. According to Cathey, he told the officers he could not get on the ground because of his colostomy bag. This testimony, however, is contradicted by the credible testimony of both MPD officers and Cathey's neighbor, Teresa Gunn, who all testified that the officers were calm and peaceful in their approach toward Cathey, that no guns were drawn, and that the men were not ordered to the ground. Cathey also testified that he was placed in handcuffs after the officers found the marijuana in his jacket. The court credits the testimony of Officers Dotson and Gunn, who testified that Cathey was not placed in handcuffs until sometime after he entered the residence.

[4] Cathey testified that, at the time, he had just been released from the hospital.

-3-

after finding the baggies of marijuana in Cathey's jacket and while they were still standing outside the apartment. Officer Dotson testified that after Cathey gave his verbal consent to search the residence, he followed up immediately with a written consent form, which Cathey signed. (Ex. 1.) Officer Dotson testified about obtaining Cathey's verbal and written consent as follows:

> Q. And what did you do after [finding the baggies of marijuana]?
>
> A. After that, I advised him - well, first I advised him of the nature of the complaint, and then I conducted a pat-down, and that is when I located the marijuana. And after that, I asked him for verbal consent and written consent to search his residence, and he stated yes.
>
> Q. Now, at this particular point, are you all outside the apartment, or are you inside the apartment when this discussion takes place?
>
> A. Outside the apartment.
>
> . . . .
>
> Q. Now, once you asked for a verbal consent, did you follow that up immediately with a written consent, or how did that take place?
>
> A. Yes, sir. We followed up right away with a written consent, and at that time he signed a written consent.
>
> . . . .
>
> Q. Once you received verbal and written consent, what did you do next?
>
> A. After that, we went inside the residence with him.
> . . .

(Hr'g Tr. 10:11-11:7; 12:1-6; 12:15-18.)

Officer Edwards, however, offered conflicting testimony regarding the circumstances in which the officers obtained Cathey's written consent. Officer Edwards testified that Cathey signed the consent form inside the apartment. According to Officer Edwards, the officers told Cathey they wanted to talk to him inside and escorted him into the apartment. Officer Edwards testified on direct and cross-examination that it was at that point that another officer handed Cathey the consent to search form:

> Q. Do you recall whether or not at any time there was a discussion asking for consent to search?
>
> A. At what time, at what point?
>
> Q. Do you recall when that discussion took place?
>
> A. Once we were inside the address.
>
> Q. You are saying that is when you all first had discussion[s] about the consent, once you were inside?
>
> A. Well, once we made contact with Cody, we escorted him back into the apartment and told him we wanted to talk with him inside the apartment.
>
> Q. Okay. What was the nature of the discussion?
>
> A. We was [sic] advising him of the complaint. We advised him we saw what we saw and were trying to clear out this complaint. If he wants to consent on whatever, we need to discuss - at that point, we gave him a decision.
>
> . . . .
>
> Q. You were the officer who handed him the consent to search form?
>
> A. No, Ma'am.
>
> Q. You observed one of the other officers do that?

A.   Yes.

   . . . .

   Q.   But you do remember that you were right there when
   y'all took him into the house, and that is when you
   talked about getting him to sign?

   A.   I remember that, yes.

(Hr'g Tr. 81:3-23; 84:12-17; 87:9-13) Upon further questioning by the government on redirect examination, Officer Edwards testified that he was not involved in the conversation that Officer Dotson had with Cathey outside of the apartment:

   Q.   You were not the reporting officer?

   A.   No, sir.

   Q.   Was, in fact, Officer Dotson the reporting officer?

   A.   Yes, sir.

   Q.   As a matter of fact, was it, in fact, Officer Dotson
   who interviewed Mr. Cathey?

   A.   Yes, sir.

   Q.   I just want to get some clarification because it's
   coming off like you were the person who was responsible
   for the interview.

   A.   No.

   Q.   Did you interview Mr. Cathey?

   A.   No, sir.

   Q.   Was your contact with Mr. Cathey?

   A.   No, sir.

   . . . .

Q. Who was responsible for interacting with Mr. Cathey?

A. The case officer, Detective Dotson.

Q. Who was having discussions with Mr. Cathey?

A. Detective Dotson.

. . . .

Q. Do you recall whether or not he gave any verbal consent?

A. I can't recall.

Q. Because was it your responsibility as it relates to interacting with him?

A. No, sir.

(Hr'g Tr. 87:21-88:11; 88:21-89:1; 89:10-15.)[5] The court finds that Cathey gave Officer Dotson verbal consent to search his apartment prior to the officers' entry into the apartment. Officer Dotson testified credibly that he obtained Cathey's verbal consent to search. Officer Edwards was not a party to Officer Dotson's conversation with Cathey, and could not recall whether or not Cathey gave verbal consent to search while outside of the apartment. Although Cathey testified that he did not give the officers verbal consent to search, the court finds Cathey's testimony to be not credible.[6] As to the officers' conflicting

---

[5]Cathey testified that he was presented with the consent form while inside the apartment.

[6]Cathey also testified that when he signed the consent to search form, he believed he was signing the form so that the officers would *stop* searching his apartment. The court finds this testimony to be not credible.

-7-

testimony regarding whether the written consent was signed outside or inside the apartment, the court need not resolve this factual dispute because Cathey provided the officers with verbal consent to search his apartment, and he never revoked his consent.

Immediately upon entering the residence, the officers observed in plain view a handgun on the living room table.[7] At that point, the officers handcuffed Cathey, placed him on the living room couch, and searched the rest of the apartment. The officers recovered additional marijuana, a black digital scale, and ammunition. Subsequently, a federal grand jury returned an indictment charging Cathey with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and one count of possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

## II. PROPOSED CONCLUSIONS OF LAW

**A. Consent to Search**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[7]Cathey testified that the officers found the gun only after he pointed it out to the officers. The court finds this testimony to be not credible.

U.S. Const. amend. IV. "Under the Fourth Amendment, searches conducted 'without a warrant issued upon probable cause are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). One such exception is when the individual gives voluntary consent that is "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." United States v. Beauchamp, 659 F.3d 560, 571 (6th Cir. 2011) (citing Moon, 513 F.3d at 537)). The government bears the burden of establishing through "clear and positive testimony" that consent to search was given voluntarily. United States v. Cochrane, 702 F.3d 334, 342 (6th Cir. 2012) (citing United States v. Salvo, 133 F.3d 943, 953 (6th Cir. 1998)). Voluntariness is determined by a totality of the circumstances analysis. Beauchamp, 659 F.3d at 571-72 (citing Bustamonte, 412 U.S. at 227; United States v. McCaleb, 552 F.2d 717, 720 (6th Cir. 1977)). This totality of the circumstances analysis involves the consideration of several factors: (1) the characteristics of the individual, including the age, intelligence, and education of the individual, whether the individual understands the right to refuse consent, and whether the individual understands his or her constitutional rights; and (2) "the details of the detention, including the length and nature of the detention, the use of coercive or punishing conduct by police,

and indications of more subtle forms of coercion that might flaw an individual's judgment." Id. at 572 (citing United States v. Watson, 423 U.S. 411, 425 (1976); United States v. Jones, 846 F.2d 358, 360 (6th Cir. 1988)). While knowledge of the right to refuse to consent to a search is relevant, "police do not have to inform an individual of his right to refuse to consent to a search." United States v. Collins, 683 F.3d 697, 702 (6th Cir. 2012) (citing Beauchamp, 659 F.3d at 572). Furthermore, a defendant's prior encounter with law enforcement may be used to prove voluntariness by showing that "he is no stranger to the police or the criminal justice system." United States v. Canipe, 569 F.3d 597, 604 (6th Cir. 2009).

The court concludes that Cathey voluntarily consented to the search of his apartment. Cathey testified at the hearing that he has earned his GED (while in prison) and considers himself to be an intelligent person. When the officers approached Cathey and the other two men, they did not draw their weapons, activate their lights or sirens, or order the men to the ground. During their interaction with Cathey, the officers spoke in a conversational tone, and Cathey seemed calm and cooperative. When Officer Dotson asked Cathey if he had anything illegal on him, Cathey voluntarily admitted that he had marijuana in his jacket pocket. The initial interaction with Cathey was brief. The officers had not arrested him or threatened to arrest him. After Cathey gave his verbal

consent, he later signed a written consent form, which provided that "[t]his written permission is being given by me to the [officers] voluntarily and without threats or promises of any kind." (Ex. 1.) There is no evidence that the officers engaged in any coercive conduct to obtain the consent. Under the totality of the circumstances, the court finds that Cathey's consent was voluntary. Therefore, the officers' search pursuant to the consent did not violate the Fourth Amendment.

**B.   Cathey's statement**

In his motion, Cathey argues that his "oral statement" to the officers should also be suppressed. Cathey does not specify in his motion which oral statement he believes should be suppressed. The government (and the court) assumes that the statement in question is the one made during the initial encounter - when Cathey told the officers that he had "smoking weed" in his jacket pocket - because there is no evidence that he made any other statements to the officers. However, Cathey goes on to argue in his motion that "[a]ny evidence obtained as a result of the search [of his apartment], including Mr. Cathey's oral statement, must be excluded because such evidence was the fruit of an illegally obtained consent, an illegal search and an illegal arrest." (Def.'s Mot. to Suppress at 6.) Because the statement at issue was made *before* the officers obtained consent, searched the apartment, and arrested

Cathey, the statement could not be the fruit of any illegal consent, search, or arrest.

### III. CONCLUSION

For the above reasons, the court recommends that Cathey's motion be denied.

Respectfully submitted,

<u>s/ Tu M. Pham</u>
TU M. PHAM
United States Magistrate Judge

<u>December 18, 2013</u>
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**