IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-20255-STA-tmp |
| | ) | |
| CODY CATHEY | ) | |
| a/k/a "CODY CATHY", | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant Cody Cathey's Motion to Suppress (D.E. # 20) filed on October 9, 2013.[1] This matter was referred to the United States Magistrate Judge for Report and Recommendation. Pursuant to the order of reference, the Magistrate Judge conducted a suppression hearing on November 25, 2013. Following the hearing, the Magistrate Judge issued his written Report recommending that the Motion to Suppress be denied (D.E. # 35, 36). On December 31, 2013, Defendant filed timely objections (D.E. # 37) to the Magistrate Judge's Report. The government has responded to the objections (D.E. # 44), and Defendant has filed a reply brief (D.E. # 45). For the reasons set forth below, the Magistrate Judge's Report and Recommendation is

---

[1] The indictment in this case charges Defendant Cody Cathey a/k/a "Cody Cathy." The record sometimes refers to Defendant as "Cathey" and at other times as "Cathy." The Court will refer to Defendant as "Cathey" or simply as "Defendant," and not by his alias, unless the Court is quoting a transcript or other filing in the record where Defendant is addressed under his alias as "Cathy."

1

**ADOPTED**, and Defendant's Motion to Suppress is **DENIED**.

## BACKGROUND

Defendant has objected only in part to the Magistrate Judge's proposed findings of fact. The Court will address each of Defendant's objections to the Report's proposed factual findings below. At the suppression hearing, the government called Officer Darryl Dotson and Officer Otis Edwards of the Memphis Police Department ("MPD") as witnesses. Defendant testified and called as witnesses Teresa Gunn (a resident of the apartment complex where the incident in question occurred) and James Hill (Cathey's nephew). The Magistrate Judge also received into evidence a consent to search form purportedly signed by Defendant. Having reviewed the testimony received by the Magistrate Judge, the parties' briefs, and the entire record of the case, the Court hereby adopts the Magistrate Judge's proposed findings of fact as follows.

On February 14, 2013, at approximately 12:45 p.m., Officer Darryl Dotson, Officer Otis Edwards, and three other officers with the MPD responded to a complaint call reporting that a black male was selling marijuana at the Foxwood Apartments, located in Memphis, Tennessee.[2] The complainant provided the MPD with a physical description of the man who was selling the drugs. The MPD had previously received numerous complaints about drugs being sold from that location. The officers arrived at the scene, set up surveillance, and observed three black men standing outside in front of the apartment. One of the men, later identified as Defendant Cody Cathey, matched the description provided by the complainant. The officers then approached the three men, without

---

[2] The Magistrate Judge entered a redacted Report and Recommendation (D.E. # 35), which omitted the physical address of the apartment complex.

drawing their weapons or activating any lights or sirens.[3] Officer Dotson approached Defendant, told him that they were there to investigate a drug complaint, and asked Defendant if he had anything illegal on him, such as drugs or weapons.[4] Defendant responded that he had "smoking weed" in his jacket pocket and also indicated that he was wearing a colostomy bag. Officer Dotson conducted a pat down of Defendant's person and located thirteen individually wrapped bags of marijuana in his jacket pocket. At that point, the officers escorted Defendant into his residence, which was on the ground level of the apartment complex about five feet away from where they were standing. Defendant was not placed in handcuffs when he entered the apartment with the officers. During the entire encounter, the officers did not raise their voices, activate their lights or sirens, or draw their weapons. Defendant appeared to be calm and was cooperative with the officers.[5]

At some point during the officers' encounter with Defendant, the officers obtained Defendant's consent to search his residence. Officer Dotson testified that he asked for and obtained

---

[3] Officer Edwards testified that the officers observed hand-to-hand drug transactions before approaching the men. Officer Dotson made no mention of observing these transactions during his testimony. Also, the government in its response brief makes no mention of the officers observing hand-to-hand drug transactions prior to approaching the three men. The government also does not rely on purported hand-to-hand transactions to support the officers' decision to approach the men.

[4] Defendant testified that the officers approached him with guns drawn and commanded him to get on the ground. According to Defendant, he told the officers he could not get on the ground because of his colostomy bag. The Magistrate Judge found that this testimony, however, was contradicted by the credible testimony of both MPD officers and Defendant's neighbor, Teresa Gunn, who all testified that the officers were calm and peaceful in their approach toward Defendant, that no guns were drawn, and that the men were not ordered to the ground. Defendant also testified that he was placed in handcuffs after the officers found the marijuana in his jacket. The Magistrate Judge credited the testimony of Officers Dotson and Gunn, who testified that Defendant was not placed in handcuffs until sometime after he entered the residence.

[5] Defendant testified that, at the time, he had just been released from the hospital.

3

Defendant's verbal and written consent to search the apartment immediately after finding the baggies of marijuana in Defendant's jacket and while they were still standing outside the apartment. Officer Dotson testified that after Defendant gave his verbal consent to search the residence, he followed up immediately with a written consent form, which Defendant signed (ex. 1). Officer Dotson testified about obtaining Defendant's verbal and written consent as follows:

> Q. And what did you do after [finding the baggies of marijuana]?
>
> A. After that, I advised him - well, first I advised him of the nature of the complaint, and then I conducted a pat-down, and that is when I located the marijuana. And after that, I asked him for verbal consent and written consent to search his residence, and he stated yes.
>
> Q. Now, at this particular point, are you all outside the apartment, or are you inside the apartment when this discussion takes place?
>
> A. Outside the apartment.
>
> . . . .
>
> Q. Now, once you asked for a verbal consent, did you follow that up immediately with a written consent, or how did that take place?
>
> A. Yes, sir. We followed up right away with a written consent, and at that time he signed a written consent.
>
> . . . .
>
> Q. Once you received verbal and written consent, what did you do next?
>
> A. After that, we went inside the residence with him.
>
> . . .

(Hr'g Tr. 10:11-11:7; 12:1-6; 12:15-18.)

Officer Edwards, however, offered conflicting testimony regarding the circumstances in which the officers obtained Defendant's written consent. Officer Edwards testified that Defendant signed the consent form inside the apartment. According to Officer Edwards, the officers told Defendant they wanted to talk to him inside and escorted him into the apartment. Officer Edwards testified on direct and cross-examination that it was at that point that another officer handed Defendant the consent to search form:

> Q. Do you recall whether or not at any time there was a discussion asking for consent to search?
>
> A. At what time, at what point?
>
> Q. Do you recall when that discussion took place?
>
> A. Once we were inside the address.
>
> Q. You are saying that is when you all first had discussion[s] about the consent, once you were inside?
>
> A. Well, once we made contact with Cody, we escorted him back into the apartment and told him we wanted to talk with him inside the apartment.
>
> Q. Okay. What was the nature of the discussion?
>
> A. We was [sic] advising him of the complaint. We advised him we saw what we saw and were trying to clear out this complaint. If he wants to consent on whatever, we need to discuss - at that point, we gave him a decision.
>
> . . . .
>
> Q. You were the officer who handed him the consent to search form?
>
> A. No, Ma'am.

> Q. You observed one of the other officers do that?
>
> A. Yes.
>
> . . . .
>
> Q. But you do remember that you were right there when y'all took him into the house, and that is when you talked about getting him to sign?
>
> A. I remember that, yes.

(Hr'g Tr. 81:3-23; 84:12-17; 87:9-13.) Upon further questioning by the government on redirect examination, Officer Edwards testified that he was not involved in the conversation that Officer Dotson had with Defendant outside of the apartment:

> Q. You were not the reporting officer?
>
> A. No, sir.
>
> Q. Was, in fact, Officer Dotson the reporting officer?
>
> A. Yes, sir.
>
> Q. As a matter of fact, was it, in fact, Officer Dotson who interviewed Mr. Cathey?
>
> A. Yes, sir.
>
> Q. I just want to get some clarification because it's coming off like you were the person who was responsible for the interview.
>
> A. No.
>
> Q. Did you interview Mr. Cathey?
>
> A. No, sir.
>
> Q. Was your contact with Mr. Cathey?
>
> A. No, sir.

. . . .

Q. Who was responsible for interacting with Mr. Cathey?

A. The case officer, Detective Dotson.

Q. Who was having discussions with Mr. Cathey?

A. Detective Dotson.

. . . .

Q. Do you recall whether or not he gave any verbal consent?

A. I can't recall.

Q. Because was it your responsibility as it relates to interacting with him?

A. No, sir.

(Hr'g Tr. 87:21-88:11; 88:21-89:1; 89:10-15.)[6]

The Magistrate Judge found that Defendant gave Officer Dotson verbal consent to search his apartment prior to the officers' entry into the apartment. According to the Magistrate Judge, Officer Dotson testified credibly that he obtained Defendant's verbal consent to search. Officer Edwards was not a party to Officer Dotson's conversation with Defendant and could not recall whether or not Defendant gave verbal consent to search while outside of the apartment. Although Defendant testified that he did not give the officers verbal consent to search, the Magistrate Judge found Defendant's testimony to be not credible.[7] As to the officers' conflicting testimony regarding

---

[6] Defendant testified that he was presented with the consent form while inside the apartment.

[7] Defendant also testified that when he signed the consent to search form, he believed he was signing the form so that the officers would *stop* searching his apartment. The Magistrate Judge found this testimony to be not credible as well.

7

whether the written consent was signed outside or inside the apartment, the Magistrate Judge determined that he did not need to resolve the factual dispute because Defendant provided the officers with verbal consent to search his apartment, and he never revoked his consent.

Immediately upon entering the residence, the officers observed in plain view a handgun on the living room table.[8] At that point, the officers handcuffed Defendant, placed him on the living room couch, and searched the rest of the apartment. The officers recovered additional marijuana, a black digital scale, and ammunition. Subsequently, a federal grand jury returned an indictment charging Defendant with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and one count of possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

In his objections to the Report and Recommendation, Defendant contests the Magistrate Judge's determination that he was not credible and Officer Dotson was credible and that Defendant gave verbal consent for the search of his apartment before the police entered the apartment. Defendant places emphasis on Officer Edwards's testimony suggesting that the police did not obtain consent to search or even discuss the matter with Defendant until they were already inside the apartment. Officer Edwards testified that he might have been the first officer to make contact with Defendant and was present when Officer Dotson interviewed Defendant. Officer Edwards stated that he could not recall whether the police received verbal consent to search before entering Defendant's apartment. Defendant argues that this testimony contradicts the Magistrate Judge's finding that Officer Edwards was not a party to the conversation between Officer Dotson and Defendant.

---

[8] Defendant testified that the officers found the gun only after he pointed it out to them. The Magistrate Judge found this testimony to be not credible.

Having reviewed the testimony presented to the Magistrate Judge *de novo*, the Court adopts the Magistrate Judge's findings of fact and overrules Defendant's objections. First, the Court finds that Defendant's testimony at the suppression hearing was not credible. Defendant maintained that he never gave consent to the search of his apartment and that the officers simply escorted him into the residence and began to search without any explanation. Both Officer Dotson and Officer Edwards testified that consent to search was obtained from Defendant at some point during the encounter and before the officers ever began to search the apartment. Defendant's objection then presents a simple factual dispute, which the Magistrate Judge resolved in favor of the police officers. Having presided over the evidentiary hearing, the Magistrate Judge "had the opportunity to view the witness on the stand and assess his demeanor"[9] and thus was "in the better position to assess the credibility of witnesses" he heard during the evidentiary hearing.[10] "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason to question the magistrate judge's assessment."[11] Based on its *de novo* review of the hearing transcript, the Court finds no reason not to adopt the Magistrate Judge's proposed finding that Defendant gave consent to search

---

[9] *Peveler v. United States,* 269 F.3d 693, 702 (6th Cir. 2001); *see also Moss v. Hofbauer,* 286 F.3d 851, 868 (6th Cir. 2002).

[10] *United States v. Woodruff*, 830 F. Supp. 2d 390, 402 (W.D. Tenn. 2011) (Mays, J.) (quoting *United States v. Robinson,* No. 1:07–CR–1, 2007 WL 2138635, at *1(E.D. Tenn. July 23, 2007)).

[11] *United States v. Brown,* No. 1:07–CR–9, 2007 WL 1345463, at *1 (E.D. Tenn. May 7, 2007). *See also United States v. Tyler*, 2:10-CR-20124-STA, 2011 WL 2551177 (W.D. Tenn. June 27, 2011); *United States v. Tuggle,* No. 2:10–cr–20042–JPM–tmp, 2011 WL 692812, at *1 (W.D. Tenn. Feb. 18, 2011) (quoting *United States v. Freeman,* No. 08–5677, 2010 WL 4244268, at *9 (6th Cir. Oct. 19, 2010)).

the apartment.

Second, the Court adopts the Magistrate Judge's decision to credit the testimony of Officer Dotson about Defendant's verbal consent. Officer Dotson's testimony about obtaining verbal consent to search Defendant's apartment before entering the home was clear and consistent. Officer Dotson stated that he conducted a pat down, located baggies of narcotics on Defendant's person, and then requested verbal and written consent from Defendant to search his apartment, all before the parties entered the home.[12] By contrast, Officer Edwards could only state that he did not recall whether the officers had obtained verbal consent before entering the residence. Officer Edwards did testify that he remembered Defendant completing the written consent form in the apartment. Officer Edwards also testified that he was not the officer with responsibility to "interact" or "have discussions" with Defendant. The government on re-direct questioned Officer Edwards about which officer had responsibility for interviewing Defendant and preparing the report, or as the government phrased its questions, which officer "was responsible for the interview" and for "interacting with Mr. Cathy" and "having discussions with Mr. Cathy."[13] According to Officer Edwards, that person was Detective Dotson. Based on this record, the Court adopts the Magistrate Judge's Report and finds

---

[12] Suppression Hr'g Tr. 11:1–7.

[13] *Id.* at 88:4–89:1. On this point Defendant has cited counsel's objection for clarification during the government's re-direct of Officer Edwards. The government questioned Officer Edwards about the police's "interview" with Defendant, to which counsel for Defendant objected. The defense argued that the government should specify which "interview" it referred to in its question. Defendant now argues that the government never responded or satisfied the defense's objection. Def.'s Objs. to Rep. & Recommendation 2. The Court finds that the government's line of questioning was sufficiently clear. The Court also notes that the defense had the opportunity to pursue its objection before the Magistrate Judge at the suppression hearing and chose not to do so. The defense also went on to re-cross Officer Edwards but also chose not follow up with him about the "interview" with Defendant.

that the officers had Defendant's verbal consent to search the apartment before they entered the building.

Finally, in light of the fact that Defendant gave verbal consent to search his home, the Magistrate Judge correctly concluded that it was not necessary to decide when the officers obtained Defendant's written consent to search. Officer Dotson testified that Defendant gave the written consent outside before the parties entered the apartment, while Officer Edwards recalled Defendant signing the written consent after the parties were in the apartment. In light of Defendant's verbal consent, the timing of his written consent is not dispositive of the legal issues presented. The Court considers the effect of Defendant's verbal consent in its analysis of the Magistrate Judge's recommended conclusions of law below.

## **STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636, the Court may refer a motion to suppress in a criminal matter to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion.[14] The Court must "make a *de novo* determination of those portions of the report or specific proposed findings or recommendations to which objection is made."[15] However, the Court is not required to conduct *de novo* evidentiary hearing as part of its *de novo* review.[16] After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.[17]

---

[14] 28 U.S.C. § 636(b)(1)(B).

[15] § 636(b)(1)(C).

[16] *Raddatz*, 447 U.S. at 674.

[17] § 636(b)(1)(C).

Moreover, the Court need not review, under a *de novo* or any other standard, those aspects of the report and recommendation to which no specific objection is made.[18] Rather, the Court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.[19]

## ANALYSIS

In addition to his objections to the Report's factual findings, Defendant has raised objections to the Magistrate Judge's recommended conclusions of law. The Magistrate Judge has proposed that the Court deny Defendant's Motion to Suppress because Defendant voluntarily consented to the search of his apartment. Defendant engaged in a consensual encounter with the officers and admitted to having narcotics in his possession. Defendant subsequently gave the officers verbal consent to search his apartment where they discovered a firearm and other contraband.

In his objections, Defendant argues that even though the incident began as a consensual encounter, he was seized as soon as the officers had probable cause to place him under arrest, i.e. when they discovered the narcotics as part of the pat down search. According to Defendant, "[n]o one in their right mind would believe that they could simply walk away from the officers at that point."[20] Defendant was then taken into his apartment, further suggesting that he was not free to end the encounter. Defendant contends that even if the police had Defendant's verbal consent to search his home, his consent was not voluntary. The officers received Defendant's consent after he was seized and "in a highly coercive atmosphere where it was reasonable for Mr. Cathey to believe that

---

[18] *Thomas v. Arn,* 474 U.S. 140, 150 (1985).

[19] *Id.* at 151.

[20] Def.'s Objs. to Rep. & Recommendation 6.

refusing consent would be a futile gesture."[21] Defendant highlights that the four police officers were attired in tactical gear with weapons visible (though not drawn) and accompanied by a German shepherd.[22] Defendant further argues that if the Court credits Officers' Edwards testimony that Defendant was asked for consent only once inside the apartment and after the officers had seen the firearm in plain view, Defendant's consent was clearly coerced. Under all of the circumstances, the Court should reject the Magistrate Judge's conclusions and hold that the police violated Defendant's Fourth Amendment rights by conducting a warrantless search of his apartment.

Based on its *de novo* review of the Magistrate Judge's Report and Recommendation and the parties' briefing on Defendant's objections, the Court hereby adopts the Magistrate Judge's proposed holdings. In this case the police had Defendant's voluntary consent to search his apartment. The United States has shown through the testimony of Officer Dotson that Defendant provided clear and unequivocal consent to search his residence before the police entered the apartment. The Magistrate Judge applied the correct legal standard and focused his analysis on the voluntariness of Defendant's consent under the totality of the circumstances. The Magistrate Judge noted that Defendant had earned his GED and that Defendant testified that he considers himself an intelligent person. The Magistrate Judge found that as the officers first approached Defendant and two other men, they did not brandish weapons, activate their lights or sirens, or order the men to the ground. The officers spoke in a conversational tone, and Defendant remained calm and cooperative. In the course of the encounter, Defendant volunteered that he had marijuana in his pockets. Even then the officers did

---

[21] *Id.* at 7.

[22] Defendant notes that the Magistrate Judge did not include these facts in his Report, though Defendant has cited evidence to support them from the hearing transcript.

not place Defendant under arrest or threaten to arrest him right away. Defendant later signed a written consent form, which stated that he was giving written permission "voluntarily and without threats or promises of any kind." The Magistrate Judge found no evidence that the police had engaged in any coercive conduct. The Court finds no error in the Magistrate Judge's application of the law to the facts presented in this case. Therefore, the Court adopts the Magistrate Judge's recommendation and holds that Defendant's verbal consent to search his apartment was voluntary under the totality of the circumstances.

Defendant has cited no evidence to show that the police engaged in coercive tactics, made promises or threats, or otherwise improperly overcame Defendant's free will. Essentially, Defendant objects that he was seized for purposes of the Fourth Amendment as soon as the officers discovered marijuana in his pockets and thereafter lacked a meaningful opportunity to refuse his consent. However, it is well-settled that "the fact of custody alone has never been enough in itself to demonstrate a coerced consent to search."[23] Rather, the Court's task is to consider a number of factors, such as (1) the characteristics of the individual, including the age, intelligence, and education of the individual, whether the individual understands the right to refuse consent, and whether the individual understands his or her constitutional rights; and (2) "the details of the detention, including the length and nature of the detention, the use of coercive or punishing conduct by police, and indications of more subtle forms of coercion that might flaw an individual's judgment."[24] The Magistrate Judge properly considered these factors and correctly decided that there was no evidence

---

[23] *United States v. Watson,* 423 U.S. 411, 424 (1976); *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995).

[24] Mag. J.'s Rep. & Recommendation 9–10 (citing *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011)).

of coercion or police misconduct to show that Defendant's consent was not freely given.[25]

What is more, there is no evidence to support Defendant's argument that his consent was "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request."[26] Defendant has cited for support the Sixth Circuit's decision in *United States v. Worley*, a case in which the Court of Appeals concluded that a defendant's consent was not voluntary. The authorities in *Worley* requested consent to search a duffel bag at Memphis International Airport.[27] In response to the officer's request to search the bag, the defendant answered, "[Y]ou've got the badge. I guess you can."[28] The district court granted the defendant's motion to suppress, and the Court of Appeals affirmed. Even though there was no evidence of the police obtaining the defendant's consent by "overt duress or coercion," the Sixth Circuit held that under all of the facts as determined by the district court, the defendant's response suggested nothing more than acquiescence to the police's request rather than knowing and voluntary consent.

The Court finds *Worley* distinguishable on its facts. Unlike *Worley*, there is no proof that Defendant subjectively felt that resistance to the officers was futile. In fact, Defendant maintains that he never gave consent at all, a contention the Court has found to be not credible. Thus, *Worley* would not apply for this reason alone. Furthermore, Officer Dotson credibly testified that he asked

---

[25] *United States v. Clark*, 377 F. App'x 451, 454–55 (6th Cir. 2010) (holding that a defendant's consent was not involuntary where "the police did not threaten him or force him to do anything, besides placing him under arrest"); *see also United States v. Elkins,* 300 F.3d 638, 648 (6th Cir. 2002) ("A defendant 'must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police' in order to invalidate consent.").

[26] *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999).

[27] *Id.* at 382.

[28] *Id.* at 383.

15

Defendant for consent to search the apartment and Defendant granted the request without any equivocation. Therefore, the Sixth Circuit's holding in *Worley* does not alter the Court's analysis.

Nor does the Sixth Circuit's decision in *United States v. Chambers* support Defendant's position that he acquiesced to the police in a "highly coercive atmosphere." The defendant in *Chambers* was suspected of manufacturing methamphetamine in his home. Instead of obtaining a warrant to search the home, the police used a "knock and talk investigative technique," meaning they knocked on the defendant's front door in an attempt to talk to the defendant and request consent to search.[29] No one came to the door, and the officers heard someone inside the home call "out that there were police at the door" and then the sound of movement in the home.[30] At that point the police forced their way in and conducted a sweep, which uncovered evidence of the meth operation. Only after the entry into the home and the discovery of the meth lab did the authorities seek and receive consent from the defendant to search the premises. The district court granted the defendant's motion to suppress, and the Sixth Circuit affirmed, holding that no exigency excused the police's warrantless entry into the home and that the defendant's consent was tainted by the illegal entry and the subsequent discovery of the contraband and the defendant's apparent arrest.[31]

The Court finds *Chambers* to be legally and factually distinguishable. The threshold issue

---

[29] 395 F.3d 563, 567 (6th Cir. 2005), *abrogated by Kentucky v. King*, 131 S. Ct. 1849 (2011). The Supreme Court in *King* discussed the strategy and identified a number of reasons law enforcement would prefer the "knock and talk" method over normal procedures for obtaining a search warrant. *King*, 131 S. Ct. at 1860.

[30] *Chambers*, 395 F.3d at 568.

[31] *Id.* at 570. Importantly, the defendant testified before the district court that he gave the officers a key to a storage shed because they "had me under arrest, I didn't know what else to do . . . I had no choice in it." *Id.*

16

presented in *Chambers* was whether some exigent circumstance justified the police's warrantless entry into a defendant's home, the question of consent to search being a secondary issue. Unlike *Chambers*, the officers here approached Defendant in a public place and initiated a consensual encounter, which was entirely permissible under the circumstances. Moreover, the Court has found that Defendant gave the officers verbal consent to search his home before the police ever went inside. This is not a case then where the police improperly gained entry to a suspect's home and discovered contraband before requesting consent to search. Thus, it cannot be said that an illegal entry into a residence tainted a suspect's later consent to search the residence. The holding in *Chambers* simply does not apply under the facts of this case. Therefore, Defendant's objections to the Magistrate Judge's recommended conclusion of law must be overruled.

## CONCLUSION

The Court holds that the police had Defendant's voluntary consent to search his apartment. As such, no violation of Defendant's constitutional rights occurred, and suppression is not warranted. Therefore, the Magistrate Judge' Report and Recommendation is **ADOPTED** and Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: February 5, 2014.